IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| ROBERT GALLAGHER )<br>)<br>Plaintiffs )<br>)<br>vs. )<br>)<br>ALLEGHENY COUNTY; RAYMOND )<br>RUSTIN, individually and in his official )<br>capacity as warden of the Allegheny County )<br>Jail; RAY BILLOTTE, individually and in )<br>his official capacity as administrator for the )<br>Pittsburgh Municipal Court of Allegheny )<br>County, )<br>)<br>Defendants ) | Civil Action No. 09-103<br>Magistrate Judge Robert C. Mitchell |

MEMORANDUM OPINION

Mitchell, M.J.

      Robert Gallagher ("Gallagher" or the "Plaintiff"), who alleges that he is hearing impaired, filed this action in the Court of Common Pleas of Allegheny County pursuant to 42 U.S.C. § 1983; the Americans with Disabilities Act ("ADA"), 42 U.S.C. § §12101, et seq.; and the Rehabilitation Act ("RA"), 29 U.S.C. §§ 791 et seq. The matter was subsequently removed to this Court. Underlying the three count Complaint (ECF No.1) is Gallagher's contention that on two separate occasions in 2006 he was denied the services of an interpreter or other assistance during Municipal Court proceedings, denied access to an assistive electronic device that would have allowed him to telephone his family from the Allegheny County Jail (the "Jail"), denied an interpreter or other means of assistance to facilitate communication with his public defender at

the Jail, and denied medication during his incarceration. Pending is the Defendants' Motion for Summary Judgment (ECF No. 34). The Motion will be granted in part and denied in part.

I. **BACKGROUND**

In January 2006, Gallagher was arrested by Pittsburgh City Police for driving a stolen rental car, and transported to the Jail to await arraignment. (ECF No. 34 Ex. B. at 9-10, 12). During an initial brief assessment by a nurse in a general holding area, Gallagher stated that he was deaf, and requested an interpreter. This request was ignored. (ECF 37 Ex.1 at 28). Gallagher was fingerprinted and photographed, and escorted to another holding area where he spent one or two hours waiting to be arraigned. (Id. at 29). He repeatedly requested an interpreter, and was assured that one would be provided. (Id. at 30).

He was then escorted from the holding area in the Jail to a second holding area in the Municipal Court. From there, he was taken to the courtroom to be arraigned. (Id. at 31). At that point, he again asked about the interpreter. "[T]he judge was sitting up high and he just motioned to me to shut-up, be quiet, whatever. And there was either a guard or a deputy on both sides of me, and they kept poking me and everything like that telling me to shut up." (Id.). Gallagher did not understand what was being said, including the charges against him. (Id. at 33). After the arraignment, he was handed some papers indicating that he had a ten percent bond at $2500. (Id.).

After Gallagher was returned to the Jail, he was placed in a holding area where inmates were allowed to make phone calls so that they could arrange bond and let their families know where they were. (Id.). Gallagher approached the guard's desk and requested an interpreter or access to a TTY or TDD[1] device. The guard replied that he had no clue what to do or whom he

---

[1] "A TTY or teletypewriter is 'an input device that allows alphanumeric characters to be typed in and sent . . . to a computer or a printer. Kennington v. Carter, No. IPO2-0648-C-T/K, 2004 WL 221376552 at 1

2

should contact. (ECF No. 1 at 17). When Gallagher asked the guard to place a phone call for him, the guard replied that he was not allowed to do so. (ECF 37 Ex.1 at 28). Although Gallagher has normal speech, he claimed that he could not use a regular telephone because he had to make certain that there was a dial tone, and had not used a regular telephone in thirty or forty years. (Id. at 36).

Gallagher was next taken to the Jail infirmary where he met with a nurse for at least thirty minutes. (Id. at 15). She took his basic information, and reviewed his medications. He took Effexor for depression, and Pertofrane and Neurontin for anxiety. During this meeting he asked the nurse for a TDD device and an interpreter, and received a response similar to the one given by the guard. Afterward, he was sent to a pod. (Id. at 17). When a public defender arrived to meet with inmates, the Plaintiff, again to no avail, asked the guards for an interpreter or other communication aid. (Id.). At a preliminary hearing where Gallagher was represented by a public defender, the case was dismissed. (Id.).

In April 2006, the Plaintiff was again arrested by Pittsburgh City Police, this time for driving his wife's car with expired tags and insurance. Gallagher recalled that he was charged with driving an uninsured vehicle, disorderly conduct, and public intoxication. (Id. at 7). His allegations regarding his lack access to an interpreter, TDD communications, and the failure to provide him with prescription medications are, in every material respect, identical to those made in connection with his January 2006 arrest.

## II.   STANDARD OF REVIEW

Summary Judgment is appropriate only where there are no genuine issues of material fact. Matsushita Elec. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). An issue of

---

n.2 (S.D. Ind. June 28, 2004) (citation omitted). A TDD "is a telephone equipped with a keyboard and display for people who are hearing – or speech impaired." Id. Because the parties refer consistently to the TDD device, the Court does the same.

material fact exists only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). While the moving party must demonstrate the absence of any genuine factual dispute, Celotex Corp. v. Catrett, 477 U.S. 317, 323(1986), the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts . . . [T]he nonmoving party must come forward with specific facts showing that there is a genuine issue for trial." Matsushita, 475 U.S. at 586-87 (1986) (emphasis in original removed).

In evaluating the evidence, the Court must view the facts and the inferences to be drawn therefrom in a light most favorable to the non-moving party. Anderson, 477 U.S. at 255. At the summary judgment stage, the Court's function is not to weigh the evidence and determine the truth of the matter, but rather to determine whether there is a genuine issue for trial. See Anderson, 477 U.S. at 249. When examining the record to see if there are genuine issues of material fact, the Court's focus is on issue finding, not on issue resolution.

## III.  ANALYSIS

### A.  Claims Brought Pursuant to Section 1983

As a prefatory matter, the Court finds it appropriate to comment on the substandard quality of the materials submitted by the parties in connection with the pending Motion. The analysis of the law is, at best, spare, and the Plaintiff has, without explanation, alleged theories of liability in his brief that are absent from or at variance with the bases of liability set forth in the Complaint. Moreover, although he alleges violations of a number of constitutional rights, he does so in the most conclusory manner, failing altogether to discuss the alleged violations in terms of the facts. "The net effect of this approach [has] put the Court in the position of doing the parties' work for them. This Court has a full docket and plenty of work of its own . . . A

4

litigant who fails to press a point by supporting it with pertinent authority or by showing why it is a good point despite a lack of authority forfeits that point." Grossman v. Jimenez, Civ. No. 91-0423 (slip op. at 5) (M.D. Pa. April 17, 1992) (quoting United States v. Giovanneti, 919 F.2d 1223, 1230 (7th Cir. 1990). See also Pennsylvania Dept. of Pub. Welfare v. United States HHS, 101 F.3d 939, 934) (3d Cir. 1996) (stating that passing references, unaccompanied by substantive argument, will not suffice to bring an issue before the court); United States Fid. & Guar. Co. v. Barron Indus., Inc., 809 F. Supp. 355, 362 (M.D. Pa. 1992) (same). With that said, the Court proceeds to claims made against the various Defendants.

1. Claims Against Rustin and Billotte [2]

    a. Official Capacity Claims

---

[2] The parties express different interpretations of the Court's Order (ECF No. 31) addressing the Plaintiff's Motion to Amend/Correct Caption and Pleadings (ECF No. 24). The Complaint as filed named as Defendants, Calvin Lightfoot ("Lightfoot"), the former Jail Warden, and others designated as Jane and John Doe (A-Z), individually and in their official capacities as wardens, guards, matrons, administrators, and/or district or magistrate judges of Allegheny County and/or the Jail.

In his Motion, Gallagher stated: "[I]t has been determined that Ramon Rustin was the warden of the [Jail] and that Raymond Billotte was the administrator for the Pittsburgh Municipal Court of Allegheny County during at least some of the relevant period." (Id. at 1). The Plaintiff asked, therefore that the caption and pleadings be amended to reflect their identities." (Id. at 2). The Court granted the Plaintiff's Motion, amending the caption to include both Ramon Rustin ("Rustin") and Raymond Billotte (Billotte"). Gallagher argues that this Order did not disturb Lightfoot's status as a Defendant, while the Defendants insist that the Order substituted Rustin for Lightfoot, given that Lightfoot's tenure as warden at the Jail ended in 2004. The Defendants' reading of the Court's Order is accurate. Gallagher does not provide -- and the Court does not find -- any basis for retaining Lightfoot as a Defendant, given that the wrongs alleged in the Complaint occurred in 2006, at least two years after Lightfoot's departure.

At this juncture, the Court will also dismiss the remaining John and Jane Doe Defendants, pursuant to Fed. R. Civ. P. 21. This rule provides that "on motion or on its own, the court may at any time, on just terms, add or drop a party." Id. "Use of John Doe defendants is permissible in certain situations until reasonable discovery permits the true defendants to be identified." Blakeslee v. Clinton County, No. 08-4313, 2009 WL 2023554 at *1 (3d Cir. July 14, 2009) (citing Klingler v. Yamaha Motor Corp., U.S.A., 738 F. Supp. 898 (E.D. Pa. 1990). See also Scheetz v. Morning Call, Inc., 130 F.R.D. 34, 37 (E.D. Pa. 1990) ("Fictitious parties must eventually be dismissed . . . if discovery yields no identities."). Gallagher has had more than thirteen months to conduct discovery in this case. This was more than adequate time in which to identify the fictitious defendants. Significantly, he did not notify the Court that he needed additional time in which to do so. The failure to identify these defendants makes establishing a constitutional violation virtually impossible.

5

To the extent that Gallagher requests monetary damages from Rustin and Billotte in their official capacities, his request for relief is dismissed.[3] See Will v. Michigan Dept. of State Police, 491 U.S. 58, 71 (1989) (holding that states, their agencies, and their employees are not, in their official capacities, "persons" subject to suit under 42 U.S.C. § 1983).

      b. The Individual Capacity Claims

In order to establish a section 1983 claim,[4] a plaintiff must show that the defendant acted under color of state law, and that the plaintiff was deprived of a constitutional right.[5] Because there is no dispute that Rustin and Billotte were state actors, the Court's focus is on whether either transgressed Gallagher's rights.[6] "[W]hen supervisory liability is imposed, it is imposed against the supervisory official in his individual capacity for his own culpable action or inaction in the training, supervision, or control of his subordinates." Clay v. Conlee, 815 F.2d 1164, 1170

---

[3] The Plaintiff does not request injunctive relief. Consequently, he does not reference any of the factors to be balanced in analyzing whether injunctive relief is warranted. See Dorsett v. New Jersey State Police, No. 04-CV-5654, 2007 WL 556890 at *6 (D.N.J. Feb. 15, 2007) (citing Ebay, Inc. v. Mercexchange, 547 U.S. 388, 391 (2006)).

[4] The relevant portion of 42 U.S.C. § 1983 reads: "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."

[5] Gallagher bases his section 1983 claims solely on the alleged violation of his constitutional – as opposed to statutory – rights.

[6] Because the Court concludes that Gallagher has failed to establish the necessary connection between these Defendants' actions and the conduct alleged to have violated his Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendment rights, the Court need not devote detailed attention to the substance of those Amendments. In the interest of full discussion, the Court does note that the Fourth and Fifth Amendments have no possible application to the facts of this case. The Fourth Amendment applies only to unreasonable searches and seizures, neither of which is substantiated by the record. The Fifth Amendment pertains only to the conduct of federal actors, and is, therefore, irrelevant here. See Bartkus v. Illinois, 359 U.S. 121 (1959). In his brief, Gallagher alleges for the first time that the Defendants violated his rights under the First Amendment. (ECF No. 38 at 8). He does not, however, say a word about the substance of that claim, nor does he cite supporting authority. As the Court has already stated, a litigant failing to support a point with legal authority or an explanation for the viability of the claim forfeits that point. See Grossman, Civ. No. 91-0423 slip op. at * 5.

(8th Cir.1987). See also Rode v. Dellarciprete, 845 F.2d 1195, 1207 (3d Cir. 2008) (reiterating that respondeat superior liability is not available under section 1983). "Supervisory liability for Section 1983 violations can be established by evidence showing that officials: (1) participated in violating a plaintiff's rights; (2) directed others to violate a plaintiff's rights; (3 ) knew of, and acquiesced in, their subordinates' violation of a plaintiff's rights; or (4) knew of, and tolerated, past or ongoing misbehavior." Campbell v. County of Allegheny, 09-127, 2010 WL 3420709 at * 3 (W.D. Pa. Aug. 11, 2010) (citing Baker v. Monroe Twp., 50 F.3d 1186, 1190-91 & n.3 (3d Cir. 1995)). The record evidence fails to establish any of these grounds for liability.

Gallagher does not allege that either of the individual Defendants participated directly in the violation of his rights, or ordered others to do so. In support of his claims against Rustin, Gallagher has attached to his Complaint an Administrative Directive dated November 25, 2002. (ECF No. 1 Ex. 2(A)). This Directive was sent from Calvin Lightfoot, the Jail's former warden, to all correctional employees, establishing procedures for inmate access to a TDD phone. Gallagher argues that his constitutional rights were violated when "Defendants failed to follow said procedures." (ECF No. 1 Ex.2 at ¶ 43). He alleges that Rustin, as the Jail warden, failed to ensure that this policy was being enforced, but does not point to evidence showing that Rustin rescinded or altered the policy, was aware that the policy was not being followed generally, or that he knew that the Directive had not been had not been followed in Gallagher's case, or in the case of any other inmate. In the absence of a showing of personal involvement, personal direction, or actual knowledge and acquiescence, a supervisory defendant cannot be liable under section 1983. See Pansy v. Preate, 870 F. Supp. 612, 630 (M.D. 1994). [7]

---

[7] In his Complaint, Gallagher rests his theory of liability on the Defendants' failure to adhere to the Administrative Directive. In his Brief, though, he posits an entirely contradictory theory, arguing instead that the Directive was illegal per se, and that its "issuance and implementation," violated his constitutional rights. (ECF NO. 38 at 8). Courts have recognized that supervisory liability may exist

7

Next, presumably in an effort to establish supervisory liability on the part of Rustin, Gallagher points to a document titled "Allegheny County Health Services, Inc. Policies and Procedures."[8] This document provides that there is to be "consultation between correctional personnel and the medical staff whenever an inmate has a significant medical . . . disability that may affect the inmate's housing, work or program assignments, imposition of disciplinary sanctions or transfer to another institution." (ECF No. 1 Ex. 2(B)). Hearing impairment is defined as a physical handicap. The Policy also provides that "when a special needs patient is identified, a nurse or other professional health care provider will inform the physician, who will make a determination and advise the classification team of the . . . living-unit and/or the type of special handling the patient requires." (Id. at 2). Finally, the Policy directs that inmates taking medication, including psychotropic . . . drugs, who are scheduled for a court appearance . . . continue their scheduled medications," and that the "medical staff . . . notify the court regarding the inmate's medication if a critical dose will be missed." (Id. at 4). No member of the ACHS staff has been identified as a Defendant in this action. Gallagher asserts that Rustin should be held liable in his supervisory capacity for failing to ensure that this policy was followed. As is the case with the first policy, however, the Plaintiff does not allege that Rustin was responsible for formulating or enforcing this Policy, or that he knew about and disregarded deviations from

---

where an official implements a policy that is "itself a repudiation of constitutional rights" and is "the moving force of the constitutional violation," Thompkins v. Belt, 828 F.2d 298, 304 (5th Cir. 1987). This authority does not help Gallagher, because the evidence does not show that the Administrative Directive, assuming that it was constitutionally deficient, was the moving force behind any constitutional injury. Gallagher has, after all, contended – and the record confirms - that the policy was not followed in his case. The policy could not, therefore, have been the cause of a constitutional violation.

[8] Allegheny Correctional Health Services, Inc. ("ACHS") is a non-profit corporation created to provide health care to inmates at the Jail.

its terms in this or any other case. The claim against Rustin cannot, therefore, survive summary judgment.

The Court turns next to allegations involving Billotte, who is named as a Defendant in his capacity as the administrator of the Pittsburgh Municipal Court of Allegheny County. In his Complaint, Gallagher alleges that Billotte was responsible "for the operational procedures, conduct, policies or customs of said district justice/magistrate court and its employees[,]" and for ensuring "that the operational procedures, conduct, policies, or customs of said district justice/magistrate court and its employees [did] not violate the laws and the constitutions of the United States of America and the Commonwealth of Pennsylvania." (ECF No. 1 Ex.2 at ¶ 10). Billotte is not mentioned again in the Complaint or in Gallagher's brief. Consequently, Gallagher has failed to establish any basis for Billotte's liability under section 1983.

In these circumstances, none of Gallagher's section 1983 claims against Rustin or Billotte survives the Defendants' Motion for Summary Judgment. See Sample v. Diecks, 885 F.2d 1099, 1118 (3d Cir.1989) ("judgment [cannot] properly be entered against [a defendant] . . . based on supervisory liability absent an identification by [the plaintiff] of a specific supervisory practice or procedure that [the defendant] failed to employ"). The Plaintiff in a civil rights case is obligated to identify specific acts or omissions on the part of the supervisor that demonstrate deliberate indifference and convince the court that there is a "relationship between the 'identified deficiency' and the 'ultimate injury.'" Brown v. Muhlenberg Twp., 269 F.3d 205, 216 (3d Cir. 2001) (quoting Sample, 885 F.2d at 1118).

    2. Allegheny County - Municipal Liability

Pursuant to section 1983, a municipality may not be held liable under a theory of respondeat superior. See Monell v. Dept. of Soc. Servs., 436 U.S. 658, 691 (1978). A

9

municipality may be liable under § 1983 only where a plaintiff is able to demonstrate that the municipality, through the implementation of a municipal policy or custom, caused a constitutional violation. A government policy exists when a "'decisionmaker possess[ing] final authority to establish municipal policy with respect to the action' issues an official proclamation, policy, or edict." Andrews v. Philadelphia, 895 F.2d 1469, 1480 (3d Cir.1990) (quoting Pembaur v. Cincinnati, 475 U.S. 469, 481 (1986)). On the other hand, "[a] course of conduct is considered to be a 'custom' when, though not authorized by law, 'such practices of state officials [are] so permanent and well settled' as to virtually constitute law." Id. (quoting Monell, 436 U.S at 690. In either instance, "the Plaintiff[ ] ha[s] the burden of showing that a government policymaker is responsible for acquiescence to the policy or custom," id. (citing Andrews, 895 F.2d at 1480), and for establishing a "direct causal link between [that] municipal policy or custom and the alleged constitutional violation." Canton v. Harris, 489 U.S. 378, 385 (1989). See also Board of County Comm'rs of Bryan County, Okl. v. Brown, 520 U.S. 397, 405 (1997).

Here, Gallagher alleges first that the County, via the Lightfoot Directive, put in place a policy that maintained barriers to the ability of hearing impaired inmates to communicate with those on the outside. It is clear, however, that the Directive, cumbersome though it may have been, was intended to *facilitate* those inmates' access to communication. Gallagher has not pointed to evidence in the record to indicate otherwise. "[A] plaintiff seeking to establish municipal liability on the theory that a facially lawful municipal policy has led an employee to violate a plaintiff's rights must demonstrate that the municipal action was taken with 'deliberate indifference' as to its known or obvious consequences." Id. at 407. Gallagher has not pointed to evidence showing deliberate indifference on the part of any county actor. More importantly, Gallagher cannot rely on application of the policy to establish municipal liability because, as he

10

contends in his Complaint, and the record makes clear, his difficulty accessing a TDD device had nothing to do with the Directive. Thus, the policy could not have been the cause of any violation of his constitutional rights.

In the alternative, Gallagher bases his assertion of municipal liability on the existence of a custom - a relevant practice so permanent and "widespread as to have the force of law." Bryan County Comm'rs, 520 U.S. at 404. He argues that although the Jail had a policy purporting to ensure accommodation of the hearing impaired, that policy was not observed or enforced. In order to establish municipal liability based on a custom, a plaintiff must show that a policy maker knew of a risk that a constitutional violation would occur, and acted with deliberate indifference to that risk. See Berg v. County of Allegheny, 219 F.3d 261, 276 (3d Cir. 2000). Neither of these requisites is satisfied. The record is devoid of evidence that Rustin,[9] even assuming that he was a County policy maker, was subjectively aware of a constitutional risk associated with the Directive itself, or of a pattern of behavior denying or impeding hearing impaired inmates' ability to communicate with the public defender. "It is well established law in this Circuit that a policy or custom, sufficient to maintain a § 1983 claim, cannot be inferred from one single instance of misconduct." Delbridge v. Whitaker, No. 2:09-4227, 2010 WL 1904456 at *5 (D. N.J. May 10, 2010) (citing Losch v. Parkesburg, 736 F.2d 903, 911 (3d Cir.1984) ("[a] policy cannot ordinarily be inferred from a single instance of illegality)).

At a July 17, 2006 meeting of the Pittsburgh/Allegheny County Task Force on Disabilities, Rustin stated that in the five years prior to January 2006, there had been no deaf prisoners in the Jail. (ECF No. 37 Ex.4 at 8). The Defendants' Answers to Interrogatories confirm that that five year period, no inmate at the Jail had filed a complaint, a grievance, or a

---

[9] Billotte, of course, had no role whatever in establishing policy at the Jail.

lawsuit pertaining to accommodations or services for the hearing impaired. (Id. Ex. 9 at ¶ 6). Given this lack of evidence, Gallagher has failed to point to establish a custom actionable under section 1983.[10]

Allegheny County is entitled to summary judgment as to Gallagher's claims of municipal liability under section 1983.

### B. Alleged Violations of the ADA and the RA

"The Supreme Court has recognized that Title II [of the ADA] prohibits 'a somewhat broader swath of conduct' than the Constitution itself forbids." Allen v. Morris, No. 493-cv-00398, 2010 WL 1382112 at *7 (E.D. Ark. Jan. 6, 2010) (quoting United States v. Georgia, 546 U.S. 151, 157 (2006)). "The ADA prohibits the exclusion of otherwise qualified participants from any program or benefits on account of their disability." Iseley v. Beard, No. 05-2108, 2006 WL 2806985 at *4 (3d Cir. October 3, 2006). The Supreme Court has held that Title II of the ADA applies to state and county prisons. See Yeskey v. Pennsylvania Dept. of Corr., 118 F.3d 168, 172 (3d Cir. 1997).

In order to survive summary judgment on a claim made pursuant to Title II, a plaintiff bears the burden of establishing that: "(1) he is a qualified individual with a disability; (2) he was either excluded from participation in or denied the benefits of some public entity's services, programs, or activities; and (3) such exclusion, denial of benefits, or discrimination was by

---

[10] The same conclusion applies to Gallagher's contention that Billotte, as a policy maker for the Pittsburgh Municipal Court, enacted a policy or condoned a custom whereby hearing impaired inmates (or any other criminal defendants) were denied interpreters during arraignments or preliminary hearings. The record is devoid of evidence showing either. In Gallagher's case, the availability of an interpreter during court proceedings was controlled by the presiding judge; Billotte was not involved. Absolute judicial immunity insulates judges in the performance of normal judicial functions and in exercising control over the courtroom while court is in session. See e.g., Mireles v. Waco, 502 U.S. 9 (1991); Duvall v. County of Kitsap, 260 F.3d 1124, 1133 (9th Cir. 2001). A judge acts in a judicial capacity in refusing to accommodate a hearing impaired defendant. Id.

reason of his disability.[11] See 42 U.S.C. § 12132; Robertson v. Las Animas County Sheriff's Dep't, 500 F.3d 1185, 1193 (10th Cir. 2007)." Lopez v. Beard, No. 08-3699, 2009 WL 1705674 at *4 n.1 (3d Cir. June 18, 2009) (footnote added). See also Schonfeld v. Carlsbad, 978 F. Supp. 1329, 1334 (S.D. Cal. 1997) (reiterating that burden of proof as to each element of Title II claim lies with the plaintiff).

At least one court has held that a plaintiff cannot rely upon mere allegations to establish that he has a disability. See Brettler v. Purdue Univ., 408 F. Supp.2d 640, 663-64 (N.D. Ind. 2006) (finding that in absence of medical records or affidavit from health care provider, plaintiff had not met his burden of proof for purposes of summary judgment). In this case, the only evidence in the record pertaining to whether Gallagher suffers from a disability is his own unsupported assertion. Although the Defendants note this lack of evidence and observe that Gallagher has more than adequate ability to communicate verbally, they do not seriously contend that he is able to hear. Consequently, the Court will consider the substance of Gallagher's ADA claims.

Gallagher contends that the Defendants violated Title II of the ADA when, based on his disability, they failed to provide him with effective means to contact his family or to

---

[11] The RA contains the additional requirement that the plaintiff show that the program or activity from which he is excluded receives federal financial assistance. See Saxe v. State Coll. Area Sch. Dist., 240 F.3d 200, 204 (3d Cir. 2001). The Court has combed the record for evidence establishing the Jail's receipt of federal funds, and has found none. Mere assertion of a fact does not constitute evidence for purposes of summary judgment. "The non-moving party cannot rest on mere pleadings or allegations; rather it must point to actual evidence in the record on which a jury could decide an issue of fact its way." Berckeley Inv. Group, Ltd. v. Colquitt, 455 F.3d 195, 201 (3d Cir.2006) ("In this respect, summary judgment is essentially 'put up or shut up' time for the non-moving party: the non-moving party must rebut the motion with facts in the record and cannot rest solely on assertions made in the pleadings, legal memoranda, or oral argument."). El v. SEPTA., 479 F.3d 232, 238 (3d Cir. 2007). Because there is no record evidence to establish a critical element of Gallagher's RA claim, the Defendants are entitled to summary judgment.

communicate with his public defender, did not ensure that he received anxiety medication, and maintained discriminatory policies or customs. (ECF No. 1 at ¶ 50).

That portion of the claim based on Gallagher's failure to receive medication can be addressed summarily. "[T]he failure to provide medical treatment to a disabled prisoner, while perhaps raising Eighth Amendment concerns in certain circumstances, does not constitute an ADA violation." Rashad v. Doughty, No. 00-6088, 2001 WL 68708 at *1 (10th Cir. Jan 29, 2001) (citing Bryant v. Madigan, 84 F.3d 246, 249 (7th Cir. 1996) (holding that ADA "does not create a remedy for medical malpractice")); McNally v. Prison Health Servs., 46 F. Supp.2d 49, 58 (D. Me. 1999) (distinguishing claims that medical treatment received was inadequate from claims that prisoner was denied access to services or programs due to disability). See also Burger v. Bloomberg, 418 F.3d 882 (8th Cir. 2005) (medical treatment decisions are not a basis for ADA claims). Gallagher alleges that he did not receive medicine for depression and anxiety, but does not allege this amounted to discrimination on the basis of a disability. In fact, the disabling condition on which his Complaint is based -- a hearing impairment -- had no relationship to the conditions for which he was or was not medicated. Insofar as Gallagher's ADA claim is based on denial of medication, it will be dismissed.

The ADA claims made against Rustin [12] in his individual capacity, also merit little discussion. Courts, including those in the Third Circuit, have held repeatedly that Title II of the ADA does not apply to actions against defendants in their individual capacities. See Duffy v. Kent County Levy Court, Civ. No. 09-198, 2010 WL 3909089 at * 3 (D. Del. Sept. 27, 2010) (collecting cases); Taylor v. Altoona Area Sch. Dist., 513 F. Supp. 2d 540, 560 (W.D. Pa. 2007) (same). "Although the Court of Appeals for the Third Circuit has not addressed the issue, [it] has

---

[12]. Gallagher has failed to establish that Billotte was involved in any way in the denial of an interpreter at any point, or that he was responsible for decisions or policy governing Gallagher's treatment at the Jail; he is thus entitled to summary judgment on the ADA claims.

held that there is no individual liability under Title III, and noted [that this] result 'comports with decisions of other courts of appeals holding that individuals are not liable under Titles I and II of the ADA, which prohibit discrimination by employers and public entities respectively.'" Id. at *3 n. 2 (quoting Emerson v. Thiel College, 296 F.3d 184,189 (3d Cir. 2002)) (citations omitted). The Court does not find that the conclusory statement in the single contrary case cited by Gallagher [13] justifies departing from the clear weight of authority. Rustin, in his individual capacity, is entitled to summary judgment on the ADA claim.

What remains, then, are Gallagher's Title II damage claims against Rustin in his official capacity and against the County itself. [14] Where a local rather than a state[15] entity is involved,

---

[13] Arguing that individual capacity suits are proper under the ADA, Gallagher cites Niece v. Fitzner, 922 F. Supp. 1208, 1219 (E.D. Mich. 1996). There, the Court stated that Title II did not explicitly authorize or prohibit suits against public actors in their individual or official capacities. "'The plain meaning of the statute dictates that public actors may not exclude disabled people from the services of a public institution. Thus, [actions of] public actor[s] such as Defendant[s] fall[ ] within the ambit of the Act' if plaintiff is excluded from services offered by the public institution." (citation omitted) (alterations in original). The second case cited by the Plaintiff, Degrafinreid v. Ricks, 417 F. Supp. 2d 403, 411 (S.D.N.Y 2006), does not address the viability of ADA claims brought against officials in their individual capacities, and in the third, Garcia v. SUNY Health Sci. Ctr. Of Brooklyn, 280 F.3d 98, 107 (2d Cir. 2001), the holding of Court of Appeals for the Second Circuit contradicts Gallagher's position; the ADA does not "provide[ ] for individual capacity suits against state officials."

[14] In Barnes v. Gorman, 536 U.S. 181 (2002), the Supreme Court held that punitive damages are not available under Title II. See also Bowers v. Nat. Collegiate Athletic. Ass'n, 346 F.3d 402,429-30 (3d Cir. 2003). According to the clear weight of authority, compensatory damages are available only upon a showing of intentional discrimination. See Douris v. Bucks County Office of the Dist. Attorney, No. Civ. A. 03-CV-5661, 2004 WL 1529169 at *5 (E.D. Pa. July 6, 2004) (explaining that in the context of the ADA, although the Court of Appeals for the Third Circuit had not addressed the issue, all other circuits to consider the question have held, either directly or by analogy to section 504 of the Rehabilitation Act, that compensatory damages under the ADA are unavailable absent showing of intentional discrimination) (citations omitted). See also Kaitlin C. ex rel. Shannon M. v. Cheltenham Twp. Sch. Dist., No. 07-2030, 2010 WL 786530 at * 5 n.6 (E.D. Pa. March 5, 2010) (collecting cases); McCree v. SEPTA, 2009 WL 166660 at *11 (E.D. Pa. Jan. 22, 2009) (same); L.T. ex rel B.T. v. Mansfield Twp. Sch. Dist., No. 04-1381, 2009 WL 737108 at * 5 (D.N.J. March 17, 2009) (same).

[15] Title II suits may proceed against individual *state* officials for prospective relief under the doctrine of Ex Parte Young, 209 U.S. 123 (1908). See Koslow v. Pennsylvania, 302 F.2d 161, 179 (3d Cir. 2002) (Title II ADA suit may, under doctrine of Ex Parte Young, be brought against state official in his official capacity for "forward looking" relief). This is because an action against a state officer for prospective relief is not deemed to be an action against the state, since the allegation of a violation of federal law

15

official capacity claims against governmental employees are treated as suits against the local entity, just as they are in claims made under section 1983. See Baribeau v. Minneapolis, 596 F.3d 465, 484 (8th Cir. 2010) (treating Title II claim against county employees in their official capacities as suit against the county); Bay v. Clermont County Sheriff's Dept., No 1:08-cv-376 2010 WL 5014226 at *4 (S.D. Oh. Nov. 3, 2010) (stating that "the proper defendant under a Title II claim is the public entity *or* an official acting in his official capacity"). Therefore, Allegheny County is the only Defendant remaining. The Court finds that as to the ADA claims against the County, Gallagher has adduced sufficient evidence of discrimination in the availability of critical services to survive summary judgment. In other words, a reasonable jury could conclude that the County's efforts to accommodate Gallagher's hearing impairment were not reasonable.

Under Title II, it is "the failure of a public entity to provide disabled persons with *reasonable* modifications [that] constitutes discrimination within the meaning of the Act." Muhammad v. Dept. Of Corr., 645 F. Supp 2d 299, 313 (D.N.J. 2008) (emphasis added) (citing Townsend v. Quasim, 328 F.3d 511, 517 (9th Cir. 2003)). See also 28 C.F.R. § 35.130 (b) (7) (requiring public entity to make "reasonable modifications in policies, practices, or procedures when modifications are necessary to avoid discrimination on the basis of disability"). Under the ADA, "a determination of whether a particular modification is 'reasonable' involves a fact-specific, case-by-case inquiry." Staron v. McDonald's Corp., 51 F.3d 353, 356 (2d Cir. 1995). In the prison setting, "the type of accommodation that will be enough to satisfy the [ADA]'s reasonableness requirement must be judged in light of the overall institutional requirements.

---

strips the officer of his official authority. See MCI Telecomm. Corp. v. Bell Atlantic-Pennsylvania, 271 F.3d 491, 506 (3d Cir. 2001). The complex Eleventh Amendment inquiry that attends Title II actions brought against states and state officials is not necessary where a county or a county employee is sued. See Chisolm v. McManimon,, 275 F.3d 315, 323 (3d Cir. 2001) (observing that "[w]hile Eleventh Amendment immunity may be available for states, its protections do not extend to counties") (citations omitted). The Ex Parte Young exception to state sovereign immunity is, therefore, irrelevant.

Security concerns, safety concerns, and administrative exigencies would all be important considerations to take into account." Love v. Westville Corr. Ctr, 103 F.3d 558, 561 (7th Cir. 1996) (internal citation omitted).

Case law and relevant regulations [16] buttress the fact that interference with an inmate's ability to communicate effectively is particularly problematic. 28 C.F.R. § 35.160 reads in part:

> (a) A public entity shall take appropriate steps to ensure that communications with applicants, participants, and members of the public with disabilities are as effective as communications with others.
>
> (b)(1) A public entity shall furnish appropriate auxiliary aids and services where necessary to afford an individual with a disability an equal opportunity to participate in, and enjoy the benefits of, a service, program, or activity conducted by a public entity.
>
> (2) In determining what type of auxiliary aid and service [are] necessary, a public entity shall give primary consideration to the requests of the individual with disabilities.

Pursuant to 28 C.F.R. § 35.104(1), auxiliary aids and services within the meaning of the act include:

> Qualified interpreters, notetakers, transcription services, written materials, telephone handset amplifiers, assistive listening devices, assistive listening systems, telephones compatible with hearing aids, closed caption decoders, open and closed captioning, telecommunications devices for deaf persons (TDD's), videotext displays or other effective methods of making aurally delivered materials available to individuals with hearing impairments.

In Chisholm v. McManimon, 275 F.3d 315 (3d Cir. 2001), the plaintiff alleged, inter alia, that Mercer County Detention Center ("MCDC") violated Title II of the ADA when it failed to provide him with a TDD device, thereby depriving him of the ability to place telephone calls, a

---

[16] The Court cites the regulations as most recently amended. These amendments did not effect any substantive change in the regulations in place in 2006.

17

deprivation not imposed upon hearing inmates. The Court of Appeals for the Third Circuit concluded that "[t]o the extent that other non-disabled inmates had access to communication by telephone, MCDC was required to provide [the plaintiff] with such access on nondiscriminatory terms." Id. at 329 (citing 42 U.S.C. § 12132). The Court rejected MCDC's arguments that the TDD and its constituent parts posed a security risk, and that MCDC had accommodated the plaintiff's needs, both by allowing an employee to make a call on his behalf, and permitting the plaintiff, after he was ultimately granted access to a TDD, "to place calls in excess of the usual fifteen minute limit to account for the delay associated with typing." Id. at 329. The Court concluded that the plaintiff's "contention that he 'could not contact his attorney, friends, or family' for lack of a TTD, raise[d] a reasonable factual inference that MCDC's alternative aids were not effective. Furthermore, there [was] no indication that MCDC complied with the requirements of Section 35.164 [17] when it refused to promptly provide [the plaintiff] with a TDD." Id. at 329-30.

If summary judgment as to Chisolm's ADA claim was inappropriate, it is equally --if not more -- inappropriate here. Although the Jail contends that it had a policy in place to accommodate hearing-impaired inmates' access to TDD devices, the record shows that under the procedures specified, access involved layers of administration and a process so convoluted that the devices were difficult – if not impossible – to access.

---

[17] This regulation reads in pertinent part:
> This subpart does not require a public entity to take any action that it can demonstrate would result in a fundamental alteration in the nature of a service, program, or activity or in undue financial and administrative burdens . . . The decision that compliance would result in such alteration or burdens must be made by the head of the public entity or his or her designee after considering all resources available . . . and must be accompanied by a written statement of the reasons for reaching that conclusion.

Personnel handling pre-arraignment processing at the Jail claimed to know nothing about how to secure a TDD device for Gallagher, and there is no evidence that they took steps to find out. Gallagher also contends that no attempt was made to provide him with an interpreter so that he could communicate effectively with the public defender about upcoming court proceedings. Post-arraignment, the lack of a TDD device left Gallagher with no way to arrange bond. In sum, the record does not reflect that Gallagher was given access to an interpreter, a TTD, or other effective hearing-related assistance at any point during his incarceration, or that efforts were to comply with the policy supposedly in place. The Court thus finds that Gallagher has succeeded in demonstrating a genuine issue of material fact with respect to whether the Defendants' efforts to accommodate his hearing impairment were reasonable. Consequently, the Motion for Summary Judgment made on behalf of the County will be denied as to Gallagher's ADA claim.

## IV. CONCLUSION

For the reasons set forth above, the Defendants' Motion for Summary Judgment (ECF No. 34) will be denied as to the Title II ADA claim made against the County. In all other respects, the Motion will be granted. An appropriate Order follows.

January 25, 2011

By the Court,

 /s/ Robert C. Mitchell
Robert C. Mitchell
United States Magistrate Judge

cc:    Counsel of Record via EM-ECF